O’MALLEY, Circuit Judge,
concurring.
I agree that the district court’s conclusions on inventorship are, as detailed in the majority opinion, supported by substantial evidence. I also agree that, by the stipulated dismissal of all state law claims and through its representations to the district court, NanoVapor’s counsel waived its right to an additional hearing on whether it has the right to assert ownership over the patent interests of Nathan and Mathe-son. I write separately, however, because I. believe that, even if we did not find waiver, 35 U.S.C. § 261 requires NanoVapor to demonstrate that any assignment of patent rights was executed in writing, which it undeniably cannot do. NanoVapor’s admission that no writing exists should render unnecessary its request for an evidentiary hearing to determine if Nathan and Matheson had- an obligation to assign their interests in the '310 patent to NanoVapor. Without an assignment in writing, Nathan and Matheson could not give NanoVapor legal title to the patents sufficient to maintain standing in a patent infringement suit for money damages. To the extent Teets v. Chromalloy Gas Turbine Corp., 83 F.3d 403 (Fed. Cir. 1996) and its progeny are to the contrary, this court should consider overruling that precedent when presented with the question in a case where the issue is determinative of the outcome.
Disoussion
35 U.S.C. § 261 provides that “[applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.” This is an explicit statutory requirement that “all assignments of patent interest be in writing.” Sky Techs. LLC v. SAP AG, 576 F.3d 1374, 1379 (Fed. Cir. 2009). The “in-writing” requirement for patent assignment goes back at least as far as the Patent Act of 1836, noting that “assignment[s] ... shall be recorded in the Patent Office within three months from the execution thereof.” Patent Act of 1836, ch. 357, § 11, 5 Stat. 117 (where recordation requires a writing); see also Patent Act of 1870, ch. 230, § 36, 16 Stat. 198 (codified as amended in 1874 as R.S. § 4898) (“[Ejvery patent or any interest therein shall be assignable in law, by an instrument in writing....”); Blakeney v. Goode, 30 Ohio St. 350, 355 (1876) (“[S]uch contracts must be in writing as affect the title to the patent; other contracts, which affect equitable interests, may be by parol.”).
In assessing whether an attempted assignment is sufficient to transfer title or ownership, courts must look to whether the parties can satisfy this “in-writing” requirement. Abbott Point of Care Inc. v. Epocal, Inc., 666 F.3d 1299, 1302 (Fed. Cir. 2012) (“Transfers of title, otherwise known as assignments, are controlled by 35 U.S.C. § 261.... ”). Without a written assignment that satisfies § 261, a party who is not the inventor simply lacks standing to bring a patent infringement suit for money damages. Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1250 (Fed. Cir. 2000) (holding that a “written instrument” was needed to document the “transfer of proprietary rights” to support standing to sue for patent infringement) (citing 35 U.S.C. § 261). Our case law, in most cases, reflects this apparently inviolable rule.
We have written, for example, that, although a license may be written, verbal, or implied, if a license is to confer standing it must be written so as to “resemble an assignment in both form and substance” to prevent parties from “engag[ing] in revisionist history, circumventing the certainty provided by the writing requirement of section 261 by claiming to be patentee by virtue of a verbal licensing arrangement.” *1352 Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1090, 1093 (Fed. Cir. 1998). And while this court has acknowledged that patent ownership may be transferred by “operation of law” rather than through a written assignment — such as by way of inheritance, see Sky Techs., 576 F.3d at 1379— § 261 applies where an employer claims an employee had an obligation to assign his or her rights in an invention to the employer.
In Teets, however, a panel of this court held that the “in-writing” requirement of § 261 can be ignored. In that case, the district court found that Teets solely owned the invention-at-issue and granted him an injunction against his employer Chromalloy, who appealed. A panel of this court resolved the conflict between the litigants on two separate theories: the shop right doctrine and an implied-in-fact contract. See 83 F.3d at 407, 408-09. This court first found that Chromalloy had a shop right, which “permits the employer to use the employee’s invention without liability for infringement.” Teets, 83 F.3d at 407. This would have been sufficient to end the inquiry on appeal — Teets could not obtain an injunction against his employer if the employer has a valid shop right, an equitable claim to use the invention. The panel further resolved the matter, however, by holding (1) that “an employee may ... freely consent by contract to assign all rights in inventive ideas to the employer” — which is certainly a correct statement of law — and (2) even “without such an express assignment,” an employer may prove the “existence of an implied-in-fact contract to assign inventive rights” under state law principles. This is where the Teets decision becomes irreconcilable with § 261. Id. at 407-08. Even with “no express agreement of any kind with Teets,” the panel not only vacated the injunction against Chromalloy, but also reversed the district court’s determination that Teets owned all rights in the patent-in-suit. It did so, moreover, without so much as a nod to the language of § 261. Id. at 409.
But § 261 cannot be ignored or rendered inapplicable by contrary state law contract principles. Section 261 is a federal statute that must prevail even where state law would otherwise allow a court to find and enforce a non-written agreement between the parties. See Sky Techs., 576 F.3d at 1379 (“Usually, federal law is used to determine the validity and terms of an assignment, but state law controls any transfer of patent ownership by operation of law not deemed an assignment.”); DDB Techs., L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 (Fed. Cir. 2008) (“Although state law governs the interpretation of contracts generally, the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases. We have accordingly treated it as a matter of federal law.”) (citation omitted); Enzo, 134 F.3d at 1093 (Fed. Cir. 1998) (holding that a plaintiff lacked standing to file suit because the purported license is not in writing, as required by federal law); see also In re CFLC, Inc., 89 F.3d 673, 679 (9th Cir. 1996) (“[Fjederal law governs the assignability of patent licenses because of the conflict between federal patent policy and state laws, such as California’s, that would allow assignability.”); PPG Indus., Inc. v. Guardian Indus. Corp., 597 F.2d 1090, 1093 (6th Cir. 1979) (“Questions with respect to the assignability of a patent license are controlled by federal law.”); Unarco Indus., Inc. v. Kelley Co., 465 F.2d 1303, 1306 (7th Cir. 1972) (“We are of the opinion that the question of assignability of a patent license is a specific policy of federal patent law dealing with federal patent law. Therefore, we hold federal law applies to the question of the assignability of the patent license in question.”). A federal *1353 statute on the law of assignments simply trumps contrary state law.
While it is true that state law principles give rise to the equitable shop rights Teets addressed in the first portion of its judgment, state law cannot create standing where federal law prohibits it. Teets’ holding to the contrary is wrong.
In this ease, NanoVapor conceded to the district court that it lacked an executed written instrument and conceded again at oral argument before this court that the non-executed document on which it relies is neither a writing under § 261 nor contains an assignment clause. At the inven-torship hearing, the district judge asked counsel for NanoVapor whether Nathan and Matheson were employees of NanoVa-por and, in particular, whether they had written employment agreements. The following exchange took place:
THE COURT: You guys had written employment agreements?
MR. RAMEY: Yes, your Honor. They weren’t actually siyned by Mr. Mathe-son or Mr. — well, Mr. Nathan signed a prospective hire agreement but Mr. Matheson didn’t even sign that. At that point, it was just the NDAs that had been signed. But they had — and the parties — the big point here is the parties were operating under them.
J.A. 731 (emphasis added). During Nathan’s redirect examination, Nathan confirmed that he never signed an employment agreement:
Q Were you ever proffered an employment agreement from NanoVapor?
A I was given employment agreements. I never siyned any of them.
Q Do you recall how many employment agreements you were given?
A Three, maybe four.
J.A. 988 (emphasis added). In its Motion for a New Trial, NanoVapor stated that, while it was undisputed “that Nathan and Matheson intended to sign [the employment] agreements when NanoVapor was funded,” “as NanoVapor was unable to secure funding by December 18, 2007, Nathan and Matheson did not sign the employment agreements and left NanoVa-por.” NanoVapor’s Motion for a New Trial at 4, Vapor Point (S.D. Tex. Apr. 3, 2015), ECF No. 330. And at oral argument in front of this court, counsel for NanoVapor again confirmed the absence of any written instrument assigning Nathan and Mathe-son’s ownership rights to NanoVapor. Oral Arg. at 01:56-02:15.
During oral argument, NanoVapor contended that, even without a signed employment agreement, this court should nevertheless remand for additional proceedings on ownership and infringement because “the courts can recognize that the person that was hired was operating pursuant to an employment agreement [under] Fifth Circuit law ... that they were performing according to the terms of that employment agreement and that employment agreement maintained that they had an obligation to assign.” Id. at 04:24-04:51. But NanoVapor immediately conceded that, whether executed or not, the employment agreement at issue had no obligation-to-assign clause. Id. at 05:03-05:24. NanoVa-por’s interpretation of the law of assignment would, moreover, undermine § 261 by conflating the requirements for an assignment sufficient to establish legal title that gives rise to standing to assert an infringement claim with those that merely give rise to equitable title under the hired-to-invent and shop right doctrines.
The Supreme Court has explained that the hired-to-invent assignment is an equitable one:
If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead *1354 title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer.
Solomons v. United States, 137 U.S. 342, 346, 11 S.Ct. 88, 34 L.Ed. 667 (1890) (emphasis added); see also Standard Parts Co. v. Peck, 264 U.S. 52, 59-60, 44 S.Ct. 239, 68 L.Ed. 560 (1924) (holding that an independent contractor engaged to “devote his time to the development of a process and machinery” to solve a particular problem for compensation had no legal right to a patent on the inventions he develops in that employment absent a contract to the contrary). Under the so-called hired-to-invent doctrine, therefore, an employer may have an equitable right to practice the claims of the patent by virtue of the employment relationship. That equitable right protects an employer from a claim of patent infringement by its employee, but does not operate to transfer legal title in the patent.
The shop right doctrine is similar. When an employee invents under the auspices of an employer, the employer will, at a minimum, have an implied right to use that invention.
[W]hen one is in the employ of another in a certain line of work, and devises an improved method or instrument for doing that work, and uses the property of his employer and the services of other employes to develop and put in practicable form his invention, and explicitly assents to the use by his employer of such invention, a jury, or a court, trying the facts, is warranted in finding that he has so far recognized the obligations of service flowing from his employment and the benefits resulting from his use of the property, and the assistance of the co-employes, of his employer, as to have given to such employer an irrevocable license to use such invention.
Solomons, 137 U.S. at 346, 11 S.Ct. 88. In this way, the concept of an equitable defense to an infringement claim merges with the shop right doctrine, which itself arises from the fact that the work done was for hire. This court has recognized shop rights as providing an employer a right to use its employee’s invention without subjecting itself to liability for infringement. In Teets itself, for example, this court noted:
Consistent with the presumption that the inventor owns his invention, an individual owns the patent rights even though the invention was conceived and/or reduced to practice during the course of employment. At the same time, however, the law recognizes that employers may have an interest in the creative products of their employees. For example, an employer may obtain a shop right in employee inventions where it has contributed to the development of the invention. A shop right permits the employer to use the employee’s invention without liability for infringement.
Teets, 83 F.3d at 407 (citations omitted).
In Gellman v. Telular Corp., 449 Fed.Appx. 941 (Fed. Cir. 2011) (nonpreceden-tial), moreover, this court clarified the equitable nature of the shop right and hired-to-invent doctrines. This court affirmed the dismissal of an infringement action brought by Ms. Gellman, the widow of one of the named inventors on the patent-in-suit. This was because Ms. Gellman failed to prove that the other co-inventor, an alleged employee of her late husband who had not joined the suit, had assigned his rights in the. patent to her. The court wisely noted:
[Ejquitable claims [of patent ownership] do not themselves confer standing.'... Courts have in some cases held that the inventions of an employee hired to make that invention fairly belong to the em *1355 ployer. But this doctrine is expressly equitable, and creates only an obligation for the employee to assign to his employer. It cannot save Ms. Gellman’s case.... For the foregoing reasons, the district court did not err in dismissing without prejudice Ms. Gellman’s case for lack of standing.”
Id. at *3 (citations omitted). But equitable title is not sufficient to confer standing to pursue money damages in a ■ patent infringement suit. “The general rule is that one seeking to recover money damages for infringement of a United States patent (an action ‘at. law’) must have held the legal title to the patent during the time of the infringement.” Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1579 (Fed. Cir. 1991) (citing Crown Die & Tool Co. v. Nye Tool & Mach. Works, 261 U.S. 24, 40-41, 43 S.Ct. 254, 67 L.Ed. 516 (1923)).
In this case, if Nathan and Matheson asserted a claim of infringement against NanoVapor- — -they did not — NanoVapor could have asserted equitable defenses under these doctrines. See Banks v. Unisys Corp., 228 F.3d 1357 (Fed. Cir. 2000) (applying hired-to-invent doctrine as an equitable defense); Teets, 83 F.3d 403 (applying shop right doctrine as an equitable defense). But where, as here, the question of affirmative standing to sue in the absence of named inventors is at issue, compliance with § 261 is mandatory. Any judicially crafted exception must bend under the unconditional language of §261. NanoVa-por’s argument that Nathan and Matheson had an obligation to assign their rights to the '310 patent, therefore, first requires the production of a written instrument reflecting such an assignment. Only then could NanoVapor pursue its infringement claims.
Conclusion
Accordingly, as NanoVapor concedes it cannot adduce an executed assignment consistent with the requirements of § 261, and never sought a court order requiring a written assignment before asserting its infringement claims, those claims must be dismissed. Nathan and Matheson — along with Moorhead — currently hold legal title to the ’310 patent and held legal title at the time suit commenced. As co-inventors on the ’310 patent, Nathan and Matheson are entitled to practice the invention without fear of suit from the other inventors, and vice versa. Dismissal of the infringement claims against Vapor Point was, thus, appropriate for this reason as well as those explained in our majority opinion. To the extent Teets indicates that it is appropriate for a court to identify an implied-in-fact contract as a basis for an assignment of patent ownership rights that gives rise to standing to seek money damages for patent infringement in the absence of a writing, we should undo that impermissible exception to the otherwise unconditional language of § 261 as soon as the appropriate opportunity arises.